IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| QUINTON MARTIN, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:21-cv-01120 |
| | ) |
| vs. | ) |
| | ) |
| JOHN WETZEL, MALINDA ADAMS, | ) |
| K. FEATHER, and ADAM MAGOON, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION[1]

Plaintiff, Quinton Martin ("Martin") commenced this civil action, proceeding *pro se*, against defendants John Wetzel, Malinda Adams, Karen Feather, and Adam Magoon ("Defendants"). Martin asserts while he was housed at the State Correctional Institution at Mercer ("SCI-Mercer"), Defendants violated his civil rights under 42 U.S.C. § 1983 by exposing him to COVID-19.

Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 44). For the reasons discussed herein, Defendants' Motion for Summary Judgment will be granted.

### I. Relevant Procedural History

Martin filed his initial Complaint on September 23, 2021 (ECF No. 10), against multiple defendants including unnamed Doe defendants. He later filed an Amended Complaint (ECF No. 19) and a Second Amended Complaint (ECF No. 26), which is the operative pleading, in which he

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case as authorized by 28 U.S.C. § 636 (ECF Nos. 2, 36). Thus, the undersigned has the authority to decide dispositive motions and enter final judgment.

1

identified the Doe defendants. The Second Amended Complaint was filed against Adam Magoon, a corrections officer at SCI-Mercer, Karen Feather, the Corrections Healthcare Administrator at SCI-Mercer, John Wetzel, the former Secretary of the Department of Corrections (DOC), and Malinda Adams, the SCI-Mercer Superintendent. None of Martin's complaints were verified. Martin asserts that the Defendants "neglected safety protocols, and precautions set as preventative measures to contracting COVID-19." ECF No. 26, p. 4.

On July 11, 2022, Defendants moved for summary judgment (ECF No. 44), and filed a Brief in Support (ECF Nos. 45, 48), a Concise Statement of Material Facts (ECF No. 47), and an Appendix of Exhibits (ECF No. 46). Martin was ordered to respond to the Motion for Summary Judgment on August 17, 2022 (ECF No. 49) but failed to do so. The Court provided a further extension of time to September 8, 2022, for Martin to respond but advised him that in the absence of a timely response, the Court would proceed to decide the motion for summary judgment on the merits (ECF No. 50). Martin failed to respond and or otherwise communicate with the Court. Indeed, Martin has not filed any pleadings or documents or communicated with the Court since December 23, 2021.

As a result, in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.C.1, the facts in Defendants' Concise Statement of Material Facts are undisputed for the purpose of resolving Defendants' Motion. Although courts provide some leniency to pro se litigants when applying procedural rules, pro se litigants may not ignore such rules. *See Peay v. CO Sager*, No. 1:16-cv-130, 2022 WL 565391, at *2 (W.D. Pa. Feb. 1, 2022), report and recommendation adopted by 2022 WL 562936 (W.D. Pa. Feb. 24, 2022) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013) and *McNeil v. United States*, 508 U.S. 106,

113 (1993)).

## II. Relevant Factual Background

1. SCI-Mercer's COVID-19 Protocols

SCI-Mercer has closely adhered to the Center for Disease Control ("CDC") guidance in matters related to the COVID-19 Pandemic. ECF No. 47, ¶ 10. SCI-Mercer followed CDC protocol specific to Correctional and Detention Facilities, the Pennsylvania Department of Health, and its own medical team to ensure the safety of inmates and staff within the facility. *Id*.

By the end of March and into April 2020, the DOC significantly reduced its transfers of inmates, limiting the transfers to only ones that were necessary. ECF 47, ¶ 11. Inmates were tested at the sending facility, transported, tested upon arrival at the receiving facility and quarantined. After a 14-day quarantine, and a negative test, then they were moved to a general population housing unit. *Id.* ¶ 12-13.

On August 10, 2020, the first inmate at SCI-Mercer tested positive for COVID-19. ECF 47, ¶ 14. The inmate's entire unit was placed on enhanced quarantine, meaning movement was limited to showers. All inmates in enhanced quarantine were observed/assessed for symptomology and had their temperatures and pulse oxygen checked twice per day. *Id.* ¶ 15. Following the first positive case at SCI-Mercer, which was also one of the first cases within the DOC, Superintendent Adams directed staff to immediately deep clean the housing unit and close down the phones and kiosks to prevent spreading the virus. On August 27, 2020, SCI-Mercer was locked down for a 72 hour cleaning. SCI Mercer was the first SCI to do a 72-hour institution wide lockdown and deep clean, with other facilities quickly adopting the same approach *Id.* ¶¶ 16-17.

During the relevant time period between April 2020 through October 2020, enhanced

quarantine on HB Unit – Martin's unit – was initiated on November 17, 2020 and lifted on December 19, 2020. When a unit was placed on enhanced quarantine, initially the inmates were only permitted out to shower daily, one cell at a time. If the enhanced quarantine period extended beyond 14 days, then the inmates would be permitted daily access to phones & kiosk in addition to the shower. Typically, the schedule would be 1 cell from the bottom tier and 1 cell from the top tier each ½ hour and they would be permitted 15 minutes to shower and then 15 minutes to use the phone & kiosk. 20. Enhanced quarantine for cells 17-20 on HB Unit was initiated on January 1, 2021 and lifted on January 14, 2021. ECF 47, ¶¶ 18-20.

During the time period when the indoor mask mandate was in effect, when doing rounds on the units or interacting with officers and/or inmates, Superintendent Adams always wore her mask. ECF 47, ¶ 23.

Various proactive preventative steps were taken to stop the spread of the virus. These preventative steps, initiated in the early stages of the pandemic, included the following: requiring that all staff and inmates wear masks; screening all incoming and outgoing inmates; subjecting all staff members to enhanced screening upon entering the facilities; mandating that inmates showing symptoms of the COVID-19 virus will be isolated and staff with symptoms will be sent home; limiting inmate movements and mandating 16 and then 8-men cohorts; and restricting visitation with family and friends to virtual methods. Additionally, PPE was provided to all staff members, including masks. The COVID vaccine and booster shots have been made available to all inmates who wish to accept them. ECF 47, ¶¶ 24-26.

Staff were regularly issued cleaning chemicals from the maintenance department. Block workers were out on the 10-6 shift, daily, cleaning the blocks, spraying the outside of cell doors

and the common areas. Cleaning chemicals were diluted the same way during COVID as they were pre COVID. (Exhibit 6) 48. From time to time, staff would pass the spray bottles, through the feeding apertures to inmates to clean their cells. ECF 47, ¶¶ 46-48.

Martin never tested positive for COVID. In November/December 2020, symptomatic inmates were tested for COVID. Had Martin presented with symptoms of COVID, or another illness, the physician would decide the proper course of treatment and what medications would, or should, be given. During the time when Martin's unit was on enhanced quarantine, nurses checked temperatures and pulse oxygen levels twice per day. ECF 47, ¶¶ 27-30.

Martin did not send any letters to the Secretary of Corrections at any time during 2020 or 2021. ECF 47, ¶ 49.

Officer Magoon was off work from October 24 to November 15, 2020 and was not present at the institution during this time. He worked on November 16 and November 17, 2020. He was not on HB unit, where Martin was housed, on either of these days. Magoon worked on November 20, 2020 but was assigned as a yard officer and did not work on HB Unit. He worked on November 21, 2020, on HB Unit. Officer Magoon did not report to work on November 22, 2020 because he woke up that morning feeling sick, and took a COVID test, that morning, that came back positive. He had no symptoms prior to the morning of November 22, 2020. After the mandatory quarantine period, and after having recovered from COVID, Magoon returned to work on December 3, 2020, and worked on HB Unit. November 22, 2020 was the only time Magoon ever tested positive for COVID. ECF 47, ¶¶ 32-41.

Magoon denies telling inmates on HB Unit that he was sick or that he had a positive COVID test because he was not at work when he had COVID. ECF 47, ¶¶ 42-43. Martin testified

that at some unknown date in November, Magoon "joked" that he "might have COVID" and at several unidentified times came to work knowing that he had tested positive. ECF 46-1, pp. 48-50.

Magoon was never told to come to work when he was sick, and he never told any of the inmates that he was instructed to come to work while ill. When the mask mandate was in effect, Officer Magoon would always wear it when doing his rounds, interacting with other officers and inmates. ECF 47, ¶ 44.

2. Grievance Process

On March 16, 2020, before the prison system implemented any COVID preventive measures, Superintendent Adams instructed the staff to remove the grievance boxes from the housing units to relieve the burden of collecting grievances in multiple places. ECF No. 47, ¶ 1. According to Adams, this decision was unrelated to COVID in any way. ECF No. 46-2, ¶ 5. When the unit grievance boxes were removed, Adams directed the staff to place the word "Grievance" on the postal mailboxes and to advertise to the prisoners the change in grievance procedure. ECF No. 47, ¶¶ 1, 3. In addition to using the postal mailbox to deposit grievances, inmates also had the option of handing their grievances directly to the Superintendent's Assistant during her weekly rounds on the units or they could use the grievance designated box in the dining hall. *Id*. ¶¶ 4, 5. However, the dining hall was inaccessible during the COVID quarantine and as of October 21, 2020, SCI-Mercer was informed that the dining hall was not going to reopen. *Id*. ¶ 6. As a result, the grievance boxes were placed back on the housing units. ECF No. 46-2, ¶ 9.

There is no documentation of a grievance submitted by Martin at any time related to this lawsuit. Martin testified in his deposition that he submitted a grievance, but he could not identify when he did so other than stating that it was "when the outbreak at this institution was high." ECF

6

No. 46-1, p. 54. When asked what the grievance was about, Martin was only able to state that it was about "just how we were being treated during this..."[2] ECF NO. 46-1, p. 55. He testified that did not receive a response. ECF No. 45, p. 4; ECF No. 46-1, pp. 8-10. There is nothing in the record that reflects the substance of the grievance Martin states that he filed, the identity or complained-of conduct of any person, including any of the defendants, to which it referred or the relief sought. Martin further testified that after there was no response to his grievance, he filed this lawsuit. ECF No. 42, p. 4; ECF No. 46-1, p. 10. Although Martin states he drafted another grievance, he never submitted it but was not prevented from doing so. ECF No. 45, p. 4; ECF No. 46-1, pp. 11-12.

### III. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine, material dispute and an entitlement to judgment. *See id.* at 323. This showing does not necessarily require the moving party to disprove the opponent's claims. Instead, this burden may often be discharged simply by pointing out for the court an

---

[2] Defendants did not submit the next page of the deposition which evidently includes the remainder of his response.

absence of evidence in support of the non-moving party's claims. *See id.*; *see, e.g.*, *Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015).

Once the moving party has met their initial burden, then the burden shifts to the non-moving party to demonstrate, by affidavit or other evidence, "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A non-moving party must "go beyond the pleadings" and show probative evidence creating a triable controversy. *Celotex*, 477 U.S. at 324. An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *See Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cnty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Although courts must hold *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary judgment stage a *pro se* plaintiff is not exempt from his burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g.*, *Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding that the *pro se* plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories…sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted); *Siluk v. Beard*, 395 F. App'x 817, 820

(3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law."); *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (*pro se* plaintiffs "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.")

**IV.   Discussion**

Martin brings his claims under 42 U.S.C. § 1983. He asserts that his civil rights under the Eighth and Fourteenth Amendments were violated when Defendants' actions exposed him to COVID-19. He claims that Adams, Feather, and Magoon neglected safety protocols and preventive measures that should have been implemented to protect inmates from contracting COVID-19. In addition, Martin asserts that Wetzel was complicit in the non-compliant behaviors of SCI-Mercer employees.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). "The first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (internal quotations and citations omitted). "Next, a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrongs.'" *Id.* (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  That is because only a person

9

who subjects, or causes to be subjected, another person to a civil rights violation can be held liable under § 1983.

Defendants assert that they are entitled to judgment in their favor because: (1) Martin failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), and (2) even if Martin had properly exhausted his administrative remedies, he failed to show that Defendants violated his civil rights (ECF No. 44).

### A. Exhaustion of Administrative Remedies

Defendants argue that Martin's grievance history reveals that he never appealed a grievance to final review. ECF No. 45, p. 5; ECF No. 46-4, ¶¶ 10-13 ("Declaration of Amanda West, Grievance Review Officer, Secretary's Office of Inmate Grievances and Appeals"). Defendants also aver that the grievance process was available to Martin, and he failed to use it. Thus, they argue, they are entitled to judgment in their favor because Martin failed to exhaust any of the claims he asserts against them in the Second Amended Complaint. ECF No. 45, p. 5.

The PLRA mandates that an inmate exhaust "such administrative remedies as are available" before bringing a suit challenging prison conditions. 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion is a "non-jurisdictional prerequisite to an inmate bringing suit" and when raised by a defendant it constitutes a threshold issue to be addressed by the court. *See, e.g., Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018).

The Supreme Court has repeatedly observed that the PLRA's exhaustion requirement "is

10

'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) and *Jones v. Bock*, 549 U.S. 199, 211 (2007)). Exhaustion is mandatory under the PLRA regardless of the type of relief sought and the type of relief available through administrative procedures. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). Courts are not given discretion to decide whether exhaustion should be excused, *Ross*, 136 S. Ct. at 1858, and there is no exception to the exhaustion requirement based on "futility." *Ahmed v. Dragovich*, 297 F.3d 201, 206 (3d Cir. 2002) (citations omitted).

The PLRA's mandatory exhaustion requirement means not only that a complaint filed before administrative remedies are exhausted is premature and cannot be entertained, it also means that failure to exhaust administrative remedies in accordance with a prison's grievance procedures constitutes procedural default. *See Woodford*, 548 U.S. at 93-95; *see also Spruill v. Gillis*, 372 F.3d 218, 227-30 (3d Cir. 2004). That is because "the PLRA's exhaustion requirement requires proper exhaustion." *Woodford*, 548 U.S. at 93; *Spruill*, 372 F.3d. at 227-30.

The prison's grievance policy is what "define[s] the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *Spruill*, 372 F.3d at 230-31 ("prison grievance procedures supply the yardstick for measuring procedural default."). Therefore, the procedural requirements for exhaustion in a given case "are drawn from the polices of the prison in question rather than from any free-standing federal law." *Shifflett v. Korszniak,* 934 F.3d 356, 364 (3d Cir. 2019) (citing *Spruill*, 372 F.3d at 231).

As stated in DC-ADM 804, an inmate must submit a grievance that includes, among other

11

things, a statement of facts relevant to the claim; the date, time and location of the occurrence; the individuals involved in the event; any claim the inmate wishes to make; and if he seeks compensation or other relief, he must request the specific relief sought.

The Court of Appeals has explained that if the defendant demonstrates that the inmate failed to exhaust his administrative remedies, then "the inmate plaintiff bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him or her." *West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019) (citing *Rinaldi*, 904 F.3d at 268). "If there is no genuine dispute of material fact, then the exhaustion defense may be evaluated as a matter of law at summary judgment." *Id.*

The DOC's official Inmate Grievance System is set forth in DC-ADM 804. It "is intended to deal with a wide range of issues, procedures, or events that may be of concern to an inmate[,]" including challenges or complaints about prison policies. DC-ADM 804, § 1.A.2; *see also id.* at p. 13, DC-ADM 804 § 1.A.13 ("[a]n inmate who has been personally affected by a Department and/or facility action or policy will be permitted to submit a grievance.").

DC-ADM 804 sets forth a three-tier administrative remedy system. A prisoner is required to present his grievance to the Facility Grievance Coordinator for initial review. *Id.*, § 1.A.5. The prisoner is required to appeal an adverse determination by the Facility Grievance Coordinator to the Facility Manager. *Id.*, § 2.A. From there the prisoner must appeal to the DOC's Secretary's Office of Inmate Grievances and Appeals ("SOIGA") for appeal to final review. *Id.*, § 2.B.

The record does not include any grievance submitted by Martin, although Martin testified that he filed one grievance at around the time that the outbreak at SCI-Mercer was high. He claims that it related to how he and other inmates were being treated. There is no evidence of record about

the specific complaints Martin may have had, what individuals, if any, engaged in allegedly wrongful conduct or what relief, if any, he sought. He testified that he did not receive a response to the grievance.

Defendants have submitted uncontroverted evidence that Martin did not appeal any grievances to final review by SOIGA. Thus, Defendants have demonstrated that there is no genuine dispute of material fact as to whether Martin exhausted his administrative remedies with respect to any claim he brings against any defendant. He did not.

Thus, the burden shifts to Martin to demonstrate that the grievance process was unavailable to him. The Supreme Court explained in *Ross* that the term "available" means "capable of use" to obtain "some relief for the action complained of." 136 S. Ct. at 1859 (quoting *Booth,* 532 U.S. at 738).

> [It] identified "three kinds of circumstances in which an administrative remedy, although officially on the books," is not "available" because it is "not capable of use to obtain relief": (1) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use," such as when no ordinary prisoner can discern or navigate it; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Rinaldi*, 904 F.3d at 266-67 (quoting *Ross*, 135 S. Ct. at 1859-60). The Court of Appeals has held "that as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement" but only as to the matters complained of and the relief sought in the grievance. *Shifflett*, 934 F.3d at 365. Absent a situation where administrative remedies are not "available," a court may not excuse an inmate's failure to exhaust "irrespective of any 'special circumstances.'" *Ross*, 136 S. Ct. at 1856.

13

Martin has not satisfied his burden of proving that any of the above-cited circumstances were present and made administrative remedies unavailable for his claims. As previously discussed, Martin failed to respond to Defendants' motion for summary judgment or their concise statement of material facts. Thus, he has not met his burden to demonstrate that the grievance process was unavailable to him. While there is some testimony by Martin in his deposition that he did not receive a response to the grievance he claims to have submitted, an administrative remedy would be unavailable to him only as to the matters complained of and the relief sought in that grievance. Even viewing the evidence in the light most favorable to Martin, the only evidence is that in that grievance, he complained about how he was treated. Martin failed to proffer any evidence that would support a claim that he submitted a grievance that complied with DOC policy. Assuming that he filed a grievance, there is no evidence whatsoever about its contents, including whether he included a statement of facts relevant to his grievance; provided the date, time and location of the occurrence(s); identified the individuals involved in the event; stated any claim he wished to make; or, if he sought compensation or other relief, requested the specific relief sought.

Thus, because Martin has failed to create a genuine issue of material fact that the administrative process was unavailable to him, he failed to exhaust his administrative remedies as required by the PLRA, Defendants' motion for summary judgment as to all federal claims asserted in this action will be dismissed with prejudice.

### B. Plaintiff's State Law Claims

Where, as is the case here, all claims over which the Court has original jurisdiction have been dismissed, the district court may decline to exercise supplemental jurisdiction over remaining state-law claims. 28 U.S.C. § 1367(c)(3). Although declining to exercise jurisdiction is within the

14

discretion of the district court, the Court of Appeals has held that, absent extraordinary circumstances, pendent jurisdiction should be declined where the federal claims are no longer viable. *See Shaffer v. Bd. of Sch. Dir. Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984) (citations omitted).

In this case, Martin's federal claims are no longer viable, and no extraordinary circumstances warrant the exercise of supplemental jurisdiction over his state-law claims. Accordingly, the Court will dismiss Martin's state-law claims without prejudice. *See, e.g.*, *Spencer v. Bush*, 543 F. App'x 209, 213 (3d Cir. 2013) (declining to decide whether state-law claims must be exhausted under the PLRA and holding that the district court should have declined to exercise supplemental jurisdiction over those claims); *Camacho v. Beers*, No. 16-cv-1644, 2018 WL 6618410, at *3 (W.D. Pa. Dec. 18, 2018) (granting judgment in the defendants' favor on the federal claims for failure to exhaust administrative remedies and declining to exercise supplemental jurisdiction over plaintiff's state-law claims).

## V. Conclusion

Based on the above, the Court will grant Defendants' Motion for Summary Judgment (ECF No. 44) as to the Eighth and Fourteenth Amendment claims asserted against them, enter judgment in their favor and against Plaintiff on these federal claims, and dismiss Plaintiff's remaining state-law claims without prejudice to bring in state court.

An appropriate order follows.

BY THE COURT:

Dated: March 10, 2023

/s/ Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge